12-mj 35

CR 12 (Rev. 5/03)

# WARRANT FOR ARREST

**United States District Court**

| | |
|---|---|
| **DISTRICT** | SOUTHERN DISTRICT OF NEW YORK |

| UNITED STATES OF AMERICA | **DOCKET NO.** | **MAGISTRATE'S CASE NO.** |
|---|---|---|
| v. | | 12 MAG 424 |
| JOHN KINNUCAN | **NAME AND ADDRESS OF INDIVIDUAL TO BE ARRESTED** | |
| | JOHN KINNUCAN | |

| WARRANT ISSUED ON THE BASIS OF: | ☐ Order of Court | |
|---|---|---|
| ☐ Indictment  ☐ Information  X Complaint | **DISTRICT OF ARREST** DISTRICT OF OREGON | |

| TO: UNITED STATES MARSHAL OR ANY OTHER AUTHORIZED OFFICER | **CITY** PORTLAND, OREGON |
|---|---|

YOU ARE HEREBY COMMANDED to arrest the above-named person and bring that person before the United States District Court to answer to the charge(s) listed below.

### DESCRIPTION OF CHARGES

Conspiracy to commit securities fraud
Conspiracy to commit wire fraud
Securities fraud

| IN VIOLATION OF | UNITED STATES CODE TITLE | SECTION |
|---|---|---|
| | 18 | 371, 1349, 2 |
| | 15 | 78J(b), 78ff |

| BAIL | OTHER CONDITIONS OF RELEASE | |
|---|---|---|
| | SOUTHERN DISTRICT OF NEW YORK | FEB 16 2012 |
| | SIGNATURE OF FEDERAL JUDGE/U.S. MAGISTRATE | DATE ORDERED |
| ORDERED BY UNITED STATES MAGISTRATE JUDGE GABRIEL W. GORENSTEIN | | |
| CLERK OF COURT | (BY) DEPUTY CLERK | DATE ISSUED |

### RETURN

This warrant was received and executed with the arrest of the above-named person.

| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
|---|---|---|
| DATE EXECUTED | | |

Note: The arresting officer is directed to serve the attached copy of the charge on the defendant at the time this warrant is executed.

12 MAG 424

12-mj 35

Approved: _____
AVI WEITZMAN
KATHERINE R. GOLDSTEIN
Assistant United States Attorneys

Before:   HONORABLE GABRIEL W. GORENSTEIN
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - x
                                  :   SEALED COMPLAINT
UNITED STATES OF AMERICA          :   Violation of 18 U.S.C.
                                  :   §§ 2, 371, 1349; 15 U.S.C.
         - v. -                   :   §§ 78j(b), 78ff; 17 C.F.R.
                                  :   §§ 240.10b-5 and 240.10b5-2
JOHN KINNUCAN,                    :
                                  :   COUNTY OF OFFENSE:
         Defendant.               :   NEW YORK
                                  :
- - - - - - - - - - - - - - - - - x

MATTHEW A. THORESEN, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

COUNT ONE
(Conspiracy to Commit Securities Fraud)

1. From at least in or about 2008 through in or about 2010, in the Southern District of New York and elsewhere, JOHN KINNUCAN, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

2. It was a part and an object of the conspiracy that JOHN KINNUCAN, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of

1

Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon any person, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

### Overt Acts

3. In furtherance of the conspiracy, and to effect the illegal object thereof, JOHN KINNUCAN, the defendant, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. On or about May 20, 2010, KINNUCAN had a telephone conversation with an employee at Flextronics International, Ltd. ("Flextronics"), during which the Flextronics employee provided KINNUCAN with material, nonpublic information ("Inside Information") concerning sales figures for the prior fiscal year and the next fiscal year for OmniVision Technologies, Inc. ("OmniVision").

b. On or about July 2, 2010, KINNUCAN had a telephone conversation with an employee at F5 Networks, Inc. ("F5"), during which the F5 employee provided KINNUCAN with Inside Information concerning F5's quarterly earnings results.

c. On or about July 2, 2010, KINNUCAN called multiple clients of Broadband Research, LLC ("BBR Clients"), several of whom were located in New York, New York, and provided them with F5 Inside Information.

d. On or about July 15, 2010, KINNUCAN called a portfolio manager who was located in New York, New York, and employed by a hedge fund located in Texas ("Hedge Fund A"), during which KINNUCAN referenced the F5 Inside Information that he had provided on an earlier occasion.

e. On or about July 21, 2010, a portfolio manager located in New York, New York caused Hedge Fund A to purchase approximately 99,000 shares of F5.

    f. On or about September 10, 2010, KINNUCAN had a telephone conversation with an employee at SanDisk Corporation ("SanDisk"), during which the SanDisk employee provided KINNUCAN with SanDisk Inside Information concerning confidential negotiations between SanDisk and Apple, Inc. ("Apple").

    (Title 18, United States Code, Section 371.)

### COUNT TWO
(Conspiracy to Commit Wire Fraud)

    4. From in or about 2008 through in or about 2010, in the Southern District of New York and elsewhere, JOHN KINNUCAN, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States of America, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343.

    5. It was a part and an object of the conspiracy that JOHN KINNUCAN, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Overt Acts

    6. In furtherance of the conspiracy and to effect the illegal object thereof, JOHN KINNUCAN, the defendant, and others known and unknown, committed the same overt acts set forth above in paragraph 3, among others, in the Southern District of New York and elsewhere.

    (Title 18, United States Code, Section 1349.)

### COUNTS THREE AND FOUR
(Securities Fraud)

    7. On or about the dates set forth below, in the Southern District of New York and elsewhere, JOHN KINNUCAN, the defendant, willfully and knowingly, directly and indirectly, by

use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, KINNUCAN caused Hedge Fund A and a hedge fund located in Menlo Park, California ("Hedge Fund B") to execute the securities transactions listed below based, in whole or in part, on material, nonpublic information:

| COUNT | BBR CLIENT | DATE | SECURITY | TRANSACTION |
|---|---|---|---|---|
| THREE | Hedge Fund B | July 2, 2010 | FFIV | purchase of 43,100 shares of common stock |
| FOUR | Hedge Fund A | July 21, 2010 | FFIV | purchase of 99,000 shares of common stock |

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.)

The basis for my knowledge and the foregoing charges is, in part, as follows:

8.   I have been a Special Agent with the FBI for approximately three years. I am currently assigned to a squad responsible for investigating violations of the federal securities laws and related offenses. I have participated in numerous investigations of such offenses and I have made and participated in making arrests of individuals for engaging in such offenses.

9.   The information contained in this Complaint is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including, but not limited to: (a) information provided

to me by the United States Securities and Exchange Commission (the "SEC"); (b) business records and other documents obtained from various entities; (c) publicly available documents; (d) analysis of court-authorized pen register records and telephone toll records; (e) information and documents provided by multiple cooperating witnesses and confidential sources of information; (f) conversations with other FBI agents and my review of reports prepared by other FBI agents; (g) my conversations with representatives of various public companies; (h) court-authorized wiretaps on a telephone subscribed to JOHN KINNUCAN, the defendant (the "Kinnucan Phone"), over which certain wire communications were intercepted on various days between in or about May 2010 and in or about September 2010; and (i) documents, including calendar entries, e-mail communications, and instant message ("IM") communications provided by cooperating witnesses and/or obtained pursuant to grand jury subpoena. Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the statements of and conversations with others are reported herein, they are reported in substance and in part. Where figures, calculations, and dates are set forth herein, they are approximate.

### Relevant Entities

10. Based on my review of documents obtained from public sources, my and other FBI agents' conversations with cooperating witnesses, my review of documents provided by clients of Broadband Research, and my review of telephone conversations intercepted over the Kinnucan Phone, I have learned the following:

   a. At all times relevant to this Complaint, Broadband Research was an investment research firm located in Portland, Oregon. Broadband Research purported to provide investment research services to its clients (collectively, "BBR Clients"), in exchange for a quarterly retainer fee of thousands of dollars per client. BBR Clients were money managers, including hedge funds, located throughout the United States, including in New York, New York, whose principal purpose was to purchase and sell securities for profit. In exchange for the services offered by Broadband Research, BBR Clients made payments of tens of thousands of dollars to Broadband Research directly, as well as indirectly through soft-dollar payments, which are

5

payments directed to Broadband Research by BBR Clients through trading activity.

b. At all times relevant to this Complaint, Hedge Fund A was an investment firm with its headquarters and principal place of business located in Texas. At all times relevant to this Complaint, Hedge Fund A was a BBR Client and paid Broadband Research a quarterly consulting fee of approximately $10,000.

c. At all times relevant to this Complaint, Hedge Fund B was an investment firm with its headquarters and principal place of business located in Menlo Park, California. At all times relevant to this Complaint, Hedge Fund B was a BBR Client and paid Broadband Research a quarterly consulting fee of approximately $20,000.

d. At all times relevant to this Complaint, F5 was a technology company that specialized in providing a platform of technologies that improve computer network security, speed, and availability. F5 was headquartered in Seattle, Washington, and was listed on the Nasdaq Stock Market (ticker symbol: FFIV). Furthermore, at all times relevant to this Complaint, F5's policies prohibited the unauthorized disclosure of F5's confidential information by F5 employees.

e. At all times relevant to this Complaint, SanDisk was a manufacturer of flash memory. SanDisk was headquartered in Milpitas, California, and was listed on the Nasdaq Stock Market (ticker symbol: SNDK). Furthermore, at all times relevant to this Complaint, SanDisk's policies prohibited the unauthorized disclosure of SanDisk's confidential information by SanDisk employees.

f. At all times relevant to this Complaint, Flextronics was a technology company that designed, engineered and manufactured electronics products for a wide array of business sectors, including technology companies. Flextronics was headquartered in Changi, Singapore, and San Jose, California, and was listed on the Nasdaq Stock Market (ticker symbol: FLEX). At all times relevant to this Complaint, Flextronics supplied certain electronic components to Apple, including camera and charger components that Apple used for its "iPhone" cellular telephones and "iPod" portable media players. Furthermore, at all times relevant to this Complaint, Flextronics' policies

prohibited the unauthorized disclosure of Flextronics' confidential information by Flextronics' employees.

   g.   At all times relevant to this Complaint, Apple was a technology company that produced, among other things, consumer electronics. Apple, headquartered in Cupertino, California, was listed on the Nasdaq Stock Market (ticker symbol: AAPL).

   h.   At all times relevant to this Complaint, OmniVision was a technology company that supplied Flextronics and other companies with sensors for the manufacture of camera modules for various Apple products, among other things. OmniVision, headquartered in Santa Clara, California, was listed on the Nasdaq Stock Market (ticker symbol: OVTI).

### Relevant Individuals

11.   Based on my review of documents obtained from public sources, my and other FBI agents' conversations with cooperating witnesses, and my review of documents obtained from the entities listed above, I have learned the following:

   a.   At all times relevant to this Complaint, JOHN KINNUCAN, the defendant, was the President of Broadband Research. On behalf of Broadband Research, KINNUCAN entered into consulting agreements with, and made representations to, certain BBR Clients, in which KINNUCAN agreed not to obtain or disseminate material, nonpublic information with respect to any publicly-traded company, not to rely on employees at public companies as sources of information, and not to make any payments to third parties or public company employees in furtherance of Broadband Research's services.

   b.   At all times relevant to this Complaint, a co-conspirator not named as a defendant herein worked as a business development manager at F5 (the "F5 Insider"), and was prohibited from disclosing F5's confidential information without authorization. The F5 Insider has been cooperating with the Government in the hope of receiving leniency. Information the F5 Insider has provided has proven to be reliable and has been corroborated by, among other things, the statements of other cooperating witnesses, court-authorized interceptions of telephone calls, e-mail communications, telephone records, and documents obtained by the Government pursuant to subpoena.

c. At all times relevant to this Complaint, a co-conspirator not named as a defendant herein worked as a Senior Director of Business Development at Flextronics (the "Flextronics Insider"), and was prohibited from disclosing Flextronics' confidential information without authorization. The Flextronics Insider has pled guilty to insider trading charges pursuant to a cooperation agreement with the Government and hopes to receive a reduced sentence. Information the Flextronics Insider has provided has proven to be reliable and has been corroborated by, among other things, the statements of other cooperating witnesses, court-authorized interceptions of telephone calls, e-mail communications, telephone records, and documents obtained by the Government pursuant to subpoena.

d. At all times relevant to this Complaint, a co-conspirator not named as a defendant herein worked as a senior director at SanDisk (the "SanDisk Insider"), and was prohibited from disclosing SanDisk's confidential information without authorization. The SanDisk Insider has been cooperating with the Government in the hope of receiving leniency. Information the SanDisk Insider has provided has proven to be reliable and has been corroborated by, among other things, the statements of other cooperating witnesses, court-authorized interceptions of telephone calls, e-mail communications, telephone records, and documents obtained by the Government pursuant to subpoena.

### Overview of The Scheme To Defraud

12. From at least in or about 2008, up to and including in or about 2010, JOHN KINNUCAN, the defendant, along with co-conspirators who were employed at publicly-traded companies (the "Public Company Sources"), and others known and unknown, participated in a scheme to defraud certain public companies of confidential information and Inside Information, in breach of the Public Company Sources' duties of trust and confidence to the public companies that employed them.

13. In furtherance of the conspiracy, and in order to develop and maintain a network of Public Company Sources, JOHN KINNUCAN, the defendant, befriended public company employees and provided them with certain monetary and non-monetary consideration. The Public Company Sources that KINNUCAN cultivated to provide him with Inside Information included the F5 Insider, the Flextronics Insider, and the SanDisk Insider, as described in greater detail below. Each of them understood that the Inside Information s/he provided to KINNUCAN would be

8

provided by KINNUCAN to BBR Clients for the purpose of executing profitable securities transactions.

14. For example, JOHN KINNUCAN, the defendant, offered to pay the Flextronics Insider and other employees at publicly-traded companies thousands of dollars in exchange for Inside Information about publicly-traded companies. KINNUCAN also invested thousands of dollars in a business venture founded by the SanDisk Insider. In addition to direct payments from KINNUCAN and Broadband Research, KINNUCAN also provided other forms of consideration to the Public Company Sources, including paying for their meals at high-end restaurants and shipping them expensive food, providing them confidential information about other technology companies and industry trends, and providing them stock trading advice and tips.

15. As JOHN KINNUCAN, the defendant, well knew, the Inside Information that the Public Company Sources provided to him was obtained by KINNUCAN in violation of: (i) fiduciary and other duties of trust and confidence the Public Company Sources owed to their employers; (ii) expectations of confidentiality held by the publicly-traded companies at which the Public Company Sources were employed; and (iii) written policies of the public companies regarding the use and safekeeping of confidential information.

16. Nonetheless, JOHN KINNUCAN, the defendant, provided the Inside Information he obtained from the Public Company Sources to certain BBR Clients, and made trading recommendations to numerous BBR Clients based, in whole or in part, on that Inside Information. KINNUCAN understood that the Inside Information he provided to BBR Clients would be used by BBR Clients for the purpose of executing and causing others to execute securities transactions based, in whole or in part, on the Inside Information.

17. In furtherance of the scheme, and in order to attract and retain BBR Clients willing to pay consulting fees to Broadband Research, JOHN KINNUCAN, the defendant, made numerous misrepresentations to BBR Clients and prospective BBR Clients. For example, KINNUCAN advised certain BBR Clients that (i) none of the information KINNUCAN obtained was provided by an employee at a public company; (ii) KINNUCAN did not pay any of his sources for their information; and (iii) the research practices of Broadband Research and the information KINNUCAN obtained from his

sources had been reviewed and approved by compliance attorneys at a law firm in San Francisco (the "Law Firm").

### KINNUCAN Obtains Inside Information From the F5 Insider

18. From my and other FBI agents' conversations with the F5 Insider and representatives of F5, and my review of toll records, publicly-available documents, e-mails, and telephone conversations intercepted over the Kinnucan Phone, I have learned the following:

   a. At various times relevant to this Complaint, JOHN KINNUCAN, the defendant, sought from the F5 Insider non-public and confidential information about F5's quarterly earnings results, earnings guidance, and other material business developments of F5. As a result of the friendship that KINNUCAN cultivated with the F5 Insider, on multiple occasions in 2009 and 2010, the F5 Insider provided KINNUCAN with, among other information, company-wide revenue figures in advance of F5's quarterly earnings announcements.

   b. For example, in or about late June 2010 and early July 2010, KINNUCAN repeatedly sought from the F5 Insider an update about F5's quarterly earnings results for the quarter ending on June 30, 2010. In a telephone call on July 2, 2010, at approximately 9:46 a.m., KINNUCAN informed the F5 Insider that the earnings guidance F5 previously provided was $220 million. The F5 Insider then told KINNUCAN that the F5 Insider "saw the number" and that the company's unadjusted revenues were "$232 million," confirming that F5 was going to beat Wall Street's consensus estimates for F5. In the same telephone call, the F5 Insider provided KINNUCAN with updates regarding F5's sales to certain significant customers, confirming that F5's sales were increasing.

   c. From conversations with a representative of F5, I have learned that the revenue figures provided by the F5 Insider to KINNUCAN were not public at the time the F5 Insider provided the information to KINNUCAN. The F5 representative further informed me that the F5 Insider owed F5 and its shareholders a duty to maintain such information in strict confidence, and that disclosure of such information to KINNUCAN was a breach of the F5 Insider's duties to F5 and its shareholders.

d. Within minutes of the July 2, 2010 conversation with the F5 Insider, KINNUCAN called numerous BBR Clients to provide them the F5 Inside Information he had just received from the F5 Insider, informing BBR Clients that F5 would have a strong quarter and "can print and guide whatever they [F5] choose" -- meaning that F5 likely would announce earnings for the current quarter and guidance for the next quarter above analysts' expectations.

e. From my review of publicly available documents, I have learned that, on or about July 21, 2010, following the close of the regular trading day, F5 announced its financial results for the third quarter of 2010, which ended on June 30, 2010. F5's announced earnings results surpassed analysts' expectations. Specifically, F5 reported revenues of $230.5 million for the quarter. Shares of F5 closed trading on July 22, 2010 at $83.40, approximately $10.29 -- or approximately 14% -- over the previous day's close.

### Hedge Fund A Executes Profitable Securities Transactions Based On KINNUCAN's Inside Information Regarding F5

19. From my review of telephone calls intercepted over the Kinnucan Phone, telephone toll records, trading records of Hedge Fund A, and e-mails and other documents provided by Hedge Fund A, there is probable cause to believe that JOHN KINNUCAN, the defendant, provided the Inside Information regarding F5's third quarter earnings to a portfolio manager ("PM-1") at Hedge Fund A and that PM-1 executed profitable securities transactions based, in whole or in part, on KINNUCAN's Inside Information.

a. As stated above, after KINNUCAN spoke to the F5 Insider on July 2, 2010, at approximately 9:46 a.m., KINNUCAN contacted numerous BBR Clients to provide them with F5 Inside Information. On or about July 2, 2010, at approximately 10:25 a.m., KINNUCAN left a voicemail message for PM-1 stating that things sounded "pretty positive" at F5. Minutes later, KINNUCAN contacted an analyst who worked for PM-1 ("Analyst-1") and informed Analyst-1 that F5 "sounds pretty good" and that he's "confident they can print and guide whatever they [F5] choose basically."

b. Within minutes of these telephone calls, PM-1 caused Hedge Fund A to purchase 43,100 shares of F5, at a price of $68.71 per share, to cover a short position Hedge Fund A had

11

in F5.[1] As a result of this trading activity, Hedge Fund B avoided losses of approximately $631,000.

       c.    In an e-mail dated July 22, 2010, PM-1 wrote to KINNUCAN: "ty [thank you] for having me cover ffiv."

### Hedge Fund B Executes Profitable Securities Transactions Based On KINNUCAN's Inside Information Regarding F5

    20.    From my review of telephone calls intercepted over the Kinnucan Phone, telephone toll records, trading records of Hedge Fund B, and e-mails and other documents provided by Hedge Fund B, there is probable cause to believe that JOHN KINNUCAN, the defendant, provided the Inside Information regarding F5's third quarter earnings to a portfolio manager at Hedge Fund B ("PM-2"), and that PM-2 executed profitable securities transactions based, in whole or in part, on KINNUCAN's Inside Information.

       a.    Based on my review of toll records, I know that KINNUCAN spoke to PM-2 at Hedge Fund B on numerous occasions between July 6, 2010, and July 21, 2010, including three telephones calls that collectively lasted longer than 26 minutes on July 6, July 16, and July 19, 2010.

       b.    On or about July 15, 2010, at approximately 7:05 p.m., KINNUCAN spoke to PM-2 by telephone. During their conversation, KINNUCAN confirmed that he had previously provided PM-2 with F5 Inside Information concerning F5's quarterly earnings, stating to PM-2 "F5 - I think we talked about that. You know, print and guide whatever they want basically. Right? We talked about that already? Right?" PM-2 responded "yeah," confirming that PM-2 had received the information from KINNUCAN.

       c.    Based on my review of Hedge Fund B's trading records, I know that on July 21, 2010, PM-2 caused Hedge Fund B to purchase approximately 99,000 shares of F5, at a price of $75.99 per share. Those shares were sold on July 22 and July 23,

---

[1] In a short sale of stock, an individual sells securities that have been borrowed from a third party with the intention of buying the securities back at a later date in hopes of profiting from a decline in the price of the securities. Conversely, if the price of the securities rise, the short seller will incur a loss.

2010, at prices ranging from $82.92 to $86.25 per share. As a result of this trading activity, Hedge Fund B earned approximately $951,000 in profit.

      d.    Based on my review of calls intercepted over the Kinnucan Phone, I know that, on July 22, 2010, the day after the F5 announcement, KINNUCAN had a telephone conversation with PM-2. During that conversation, PM-2 thanked KINNUCAN for the information he provided regarding F5. PM-2 stated that everybody at the hedge fund where PM-2 is employed "is happy with me today" because others at the hedge fund "did not want to be long this stock," but PM-2 convinced others to purchase F5 stock in advance of the earnings announcement after receiving the F5 information from KINNUCAN.

### KINNUCAN Obtains Inside Information From The Flextronics Insider

    21.    From my and other FBI agents' conversations with the Flextronics Insider and representatives of Flextronics, as well as my review of telephone calls intercepted over the Kinnucan Phone, e-mails between the Flextronics Insider and JOHN KINNUCAN, the defendant, and business records provided by Flextronics, I have learned the following:

      a.    In or about 2008, soon after KINNUCAN met the Flextronics Insider, KINNUCAN offered to pay the Flextronics Insider $10,000 per quarter in return for confidential information and Inside Information about Flextronics and various of its customers and suppliers. The Flextronics Insider agreed to the proposal and, thereafter, KINNUCAN frequently sought and obtained confidential information and Inside Information from the Flextronics Insider.

      b.    The Flextronics Insider periodically provided KINNUCAN with, among other things, Flextronics' monthly sales and forecasts for certain Apple products, and provided KINNUCAN with nonpublic and confidential information about new product developments at Apple. As the Flextronics Insider well knew, disclosure of these confidential details regarding Apple violated both a non-disclosure agreement Flextronics had signed with Apple and the duties of confidentiality the Flextronics Insider owed to Flextronics.

      c.    For example, on or about June 21, 2010, the Flextronics Insider had a telephone conversation with KINNUCAN, during which the Flextronics Insider told Kinnucan that, based on

13

recent meetings with Apple, Apple was not expected to ship more than three to four million iPhone-4's this quarter, although he did not know precisely how many phones in total Apple will sell this quarter. KINNUCAN asked the Flextronics Insider to "pin this down with very high confidence" because it "could be very, very valuable." The Flextronics Insider agreed to make some calls to answer KINNUCAN's question. A couple of hours later that day, the Flextronics Insider had a follow-up telephone conversation with KINNUCAN, during which the Flextronics Insider provided Kinnucan the maximum number of iPhones Apple could produce in the quarter.

    d. As part of the Flextronics Insider's employment at Flextronics, the Flextronics Insider obtained and provided to KINNUCAN confidential information and Inside Information about OmniVision's unit sales, shipment numbers, and sales forecasts for OmniVision's camera sensors to Apple. The Flextronics Insider knowingly provided such information to KINNUCAN in breach of the Flextronics Insider's duties of confidentiality and loyalty.

    e. In total, from in or about 2008 through in or about 2010, JOHN KINNUCAN, the defendant, paid the Flextronics Insider approximately $27,500 for confidential information and Inside Information from the Flextronics Insider.

### KINNUCAN Obtains Inside Information From The SanDisk Insider

  22. From my conversations with the SanDisk Insider, and my review of e-mails between the SanDisk Insider and JOHN KINNUCAN, the defendant, telephone calls intercepted over the Kinnucan Phone, and documents provided by SanDisk, I have learned the following:

    a. At various times relevant to this Complaint, KINNUCAN sought and obtained from the SanDisk Insider Inside Information and confidential information, including, among other things, information about SanDisk's sales and revenues. In exchange for information from the SanDisk Insider, KINNUCAN provided certain consideration to the SanDisk Insider, including paying for meals at high-end restaurants and shipping the SanDisk Insider expensive food, and providing the SanDisk Insider confidential information about other technology companies and industry trends.

    b. For example, on or about July 21, 2010, at approximately 8:07 p.m., the SanDisk Insider informed KINNUCAN over the telephone that SanDisk's anticipated earnings for the year would be approximately $4.95 billion. At the time, this information was not public and the SanDisk Insider was required to maintain it in strict confidence.

    c. In addition, on or about September 10, 2010, at approximately 7:51 p.m., the SanDisk Insider had a telephone conversation with KINNUCAN. During the conversation, KINNUCAN agreed to provide the SanDisk Insider with $25,000 as an investment in a business that the SanDisk Insider was starting. KINNUCAN told the SanDisk Insider that "you've been extremely helpful to me, so it's the very least I can do."

    d. Later in the same conversation on September 10, 2010, the SanDisk Insider told KINNUCAN about certain confidential negotiations over a legal dispute between SanDisk and Apple that were expected to be finalized within 6 weeks, and expected to be positive for SanDisk's business. The SanDisk Insider explained that once finalized, SanDisk would have to file a Form 8-K with the U.S. Securities and Exchange Commission to disclose material corporate events to shareholders and the public. KINNUCAN thanked the SanDisk Insider and stated that he would be "very thoughtful and circumspect" with the information.

    e. Shortly after his September 10, 2010 conversation with the SanDisk Insider, KINNUCAN contacted several BBR Clients and advised them against short selling SanDisk stock for the next six weeks.

### KINNUCAN's Misrepresentations About His Business Practices And The Sources Of His Inside Information

  23. From my review of telephone conversations intercepted over the Kinnucan Phone, documents obtained from BBR Clients, and e-mails sent by JOHN KINNUCAN, the defendant, I have learned that KINNUCAN made numerous misrepresentations to various BBR Clients and prospective clients about the sources of his Inside Information, in an effort to induce them to hire and pay Broadband Research for its services. Among other mispresentations, KINNUCAN advised BBR Clients that he did not have any sources who were employed at public companies, even though, as described above, he had multiple sources of Inside Information at public companies.

15

a. On or about June 17, 2010, at approximately 12:26 p.m., KINNUCAN had a telephone conversation with another prospective BBR Client. During the telephone conversation, KINNUCAN misled the potential client to believe that he had no sources of information at public companies. KINNUCAN stated with respect to insider trading:

> I believe . . . this is a lot of gray areas, as we both know, but . . . all the companies I talk to are . . . privately held partnerships, resellers, manufacturer's reps around the country. Four or five guys, they're all principals, so they're entitled to talk to me if they so choose. And you know, if they say, "wow, wow, we're really pumped about this new F5 . . . the customers seem really interested in it, and the business momentum seems really good." And we hear that from four or five different places around the country, we feel confident in extrapolating. So, that's basically . . . how we do business. . . .
>
> If I come to you and say, "hey, I just played golf with [the] CFO of, uh, let's say F5 and he says, 'the numbers for this quarter are dah-dah-dah.'" . . . You know, well that's probably not copacetic, right? On the other hand, if, if I . . . talk to a bunch of resellers or distributors, . . . . [and] they're all saying the same thing and -- you gotta look at that and say, "well, that's pretty much what . . . [numerous other companies are] doing what we do.

KINNUCAN, however, did not inform this prospective BBR Client that he also had a source of Inside Information within F5.

b. I have reviewed a copy of a letter, dated September 16, 2010, that KINNUCAN signed and faxed to the compliance department of Hedge Fund B. In that letter, KINNUCAN represented the following: that "[n]o industry contacts of [Broadband Research] work for a public company on which [Broadband Research] provides research" and that Broadband Research "does not pay any compensation to its industry contacts."

c. I have reviewed a compliance business record, dated September 27, 2010, of another BBR Client. The record reflects statements made by KINNUCAN in response to questions from the BBR Client's compliance department regarding the

services provided by Broadband Research. KINNUCAN informed the BBR Client that the information he provided was exclusively "from 3rd party sales reps from value added resellers (VARs)" and that these VARS are private companies. KINNUCAN expressly (and falsely) stated that he did not speak to public company employees. Similarly, in an agreement dated September 29, 2010 between Broadband Research and this same BBR Client, KINNUCAN expressly agreed that he would "not make any payments to any third party in furtherance of performing [his consulting] duties."

24. The above representations made by JOHN KINNUCAN, the defendant, regarding his sources of information were materially false. As stated above, KINNUCAN obtained confidential information and Inside Information from Public Company Sources, including at F5, SanDisk, and Flextronics. Moreover, KINNUCAN paid the Flextronics Insider for Inside Information, in breach of the Flextronics Insider's fiduciary duties.

25. From my review of telephone conversations intercepted over the Kinnucan Phone, documents obtained from BBR Clients, and documents obtained from the Law Firm, I have learned that, in addition to misleading clients about the sources of his information, JOHN KINNUCAN, the defendant, also misled current and prospective BBR Clients to believe that his research practices and the information he obtained from his sources have been reviewed and approved by the compliance department of the Law Firm.

 a. In the June 17, 2010 telephone conversation with the prospective BBR Client summarized in paragraph 23 above, KINNUCAN told the prospective BBR Client that his "compliance attorney" worked at the Law Firm and that the compliance attorney was a former "compliance enforcement attorney" with the SEC.

 b. Similarly, as reflected in the September 27, 2010 business record summarized in paragraph 24 above, KINNUCAN expressly told the BBR Client's compliance department that he outsourced his compliance to the Law Firm.

 c. Based on my review of documents provided by the Law Firm, and representations made by the Law Firm, I have learned that the Law Firm never vetted any of Broadband Research's business practices and never conducted any compliance review for KINNUCAN.

WHEREFORE, deponent prays that an arrest warrant be issued for the above-named defendant and that he be imprisoned or bailed as the case may be.

FEB 16 2012

MATTHEW A. THORESEN
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
____ day of February 2012

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

18